(No. 41687.—

ROBERT W. TUNNELL *vs.* THE EDWARDSVILLE INTELLI-GENCER, INC., Appellant.—(Lena S. Tunnell, Executrix, Appellee.)

*Opinion filed Sept. 26, 1969.—Rehearing denied Nov. 25, 1969.*

GORDON BURROUGHS, of BURROUGHS, SIMPSON & BUR
ROUGHS, of Edwardsville, and EMERSON BAETZ, of Alton,
for appellant.

DICK H. MUDGE, JR., of Edwardsville, for appellee.

Mr. JUSTICE SCHAEFER delivered the opinion of the
court:

This case is here on leave granted to appeal from a judgment of the Appellate Court, Fifth District. 99 Ill. App. 2d
1.

The original plaintiff, Robert W. Tunnell, brought this
action in the circuit court of Madison County, alleging that
he had been defamed in a newspaper article published by the
defendant, Edwardsville Intelligencer, Inc., during a mayoralty campaign in the city of Edwardsville. The article
charged that the incumbent mayor was ignoring a local
ordinance and a State statute by making repeated temporary
appointments to the police and fire departments of the city.
It referred to Robert W. Tunnell who, as city attorney, had
been involved in interpreting the applicable statutes and
ordinances, and concluded with the allegedly defamatory
statement: "Rumors on the main stem today had it that
Atty. Tunnell was working to break the law, whether it was
the city or state law was not explained."

The case was tried by jury, and at the close of the evidence the defendant moved for a directed verdict. The trial judge reserved his ruling, and submitted the case to the jury. Among the instructions given was one submitted by the plaintiff which told the jury that if they found that the article was published with actual malice, "you may award the plaintiff compensatory damages or punitive damages or both compensatory and punitive damages." The jury returned the following verdict: "We, the jury, find in favor of the plaintiff and against the defendant, and assess plaintiff's compensatory damages in the sum of $None and punitive damages in the sum of $35,000."

The verdict was returned on May 11, 1966. The trial judge did not at once enter judgment on the verdict in accordance with section 68(2) of the Civil Practice Act. (Ill. Rev. Stat. 1965, ch. 110, par. 68(2).) On June 29, 1966, he ruled upon the defendant's reserved motion, set aside the verdict and entered judgment for the defendant. Thereafter the court overruled the plaintiff's post-trial motion, and the plaintiff appealed.

After the briefs of both parties had been filed in the appellate court, Robert W. Tunnell died and his executor, Lena S. Tunnell, sought to be substituted as plaintiff. The defendant moved to dismiss the appeal on the ground that the plaintiff's death caused the action to abate. The appellate court allowed the substitution, and on the merits reversed the judgment for defendant and entered judgment for plaintiff. 99 Ill. App. 2d 1.

We first consider the appellate court's ruling on the abatement issue, for if the action abated it will be unnecessary to review the issues that are raised upon the merits.

At common law, a cause of action for a purely personal injury did not survive the death of either the injured party or the wrongdoer. Actions for libel and slander—based on injury to a most intimate human quality, reputation—were clearly of the sort which did not survive (*Reed* v. *Real De-*

*tective Publishing Co.,* 63 Ariz. 294, 162 P.2d 133; *Benton* v. *Knoxville News-Sentinel Co.,* 174 Tenn. 658, 130 S.W.2d 105), and a pending defamation action was held to abate upon the death of either party. (See Anno. 134 A.L.R. 717.) While section 339 of the Probate Act has reversed the general rule with regard to the abatement of actions for personal injury, actions for slander and libel are specifically excepted from the statute, and remain subject to the common-law rule. Ill. Rev. Stat. 1965, ch. 3, par. 339; see *Carlson* v. *Dell Publishing Co.,* 65 Ill. App. 2d 209; *Chiagouris* v. *Jovan,* 43 Ill. App. 2d 220.

Even as to actions which do not survive, however, there is no abatement upon the death of a party if the litigation has progressed to a point at which the merits of plaintiff's allegations have been affirmatively determined. This principle is most frequently applied in those cases in which the plaintiff has secured a judgment after a trial. The death of either party pending an appeal from that judgment will not abate the action. The cause of action is said to have merged in the judgment and, thus, the common-law rule of abatement is inapplicable. (*Castelluccio* v. *Cloverland Dairy Products Co.,* 165 La. 606, 115 So. 796; *Gordon* v. *Hillman,* 102 Wash. 411, 173 Pac. 22; *Akers* v. *Akers,* 84 Tenn. 7.) So too, when a plaintiff dies after having received a verdict in his favor but before the entry of judgment, his action does not abate and he is entitled to judgment upon that verdict. *Garret* v. *Byerly,* 155 Wash. 351, 284 Pac. 343; *Rosenblum* v. *Ginis,* 297 Mass. 493, 9 N.E.2d 525; *Hilker* v. *Kelley,* 130 Ind. 356, 30 N.E. 304.

In the present case, however, the verdict in favor of the plaintiff was subsequently set aside, and judgment was entered for the defendant. There are numerous cases which hold that the death of a plaintiff pending his appeal from a judgment for the defendant in a nonsurviving action abates the action and the appeal must be dismissed. (*Martin's Admr.* v. *Baltimore and Ohio Railroad Co.,* 151 U.S. 673,

38 S. Ct. 311; *Eades* v. *House,* 3 Ariz. App. 245, 413 P.2d 576; *In re Samson's Estate,* 142 Neb. 556, 7 N.W.2d 60; *Mills* v. *Alexander,* 206 Ark. 754, 177 S.W.2d 406; see also *Nicora* v. *Demosthenes,* 69 Nev. 137, 243 P.2d 253; but see 1 Freeman, Judgments, sec. 133, p. 250.) Each of these decisions, however, involved a situation in which both the verdict and the judgment were for the defendant in the trial court. They proceeded upon the ground that since the plaintiff does not have a verdict in his favor, "if the judgment below against [plaintiff] * * * be reversed * * *, no new trial could be had, because the action abated by his death." *Martin's Admr.* v. *Baltimore and Ohio Railroad Co.,* 151 U.S. 673, 703.

The present case does not present that problem. The plaintiff received a verdict in the trial court and when the motion to substitute his executor was made in the appellate court, the plaintiff's post-trial request for a new trial was withdrawn. If the appellate court decided the merits of the case in favor of the plaintiff, there was no need to retry it, for judgment could be entered on the verdict.

In cases like this one, reviewing courts have recognized that it is inappropriate to dismiss an appeal upon the death of the plaintiff-appellant. "Where it is found that the trial court improperly granted a judgment notwithstanding the verdict, it would be an unjust rule that would deny appellant relief as of the date of the submission of the motion .* * *" *Nenezich* v. *Elich,* 183 Wash. 657, 49 P.2d 33; see also *Coughlin* v. *District of Columbia,* 106 U.S. 7, 27 L. Ed. 74; *Carl* v. *Department of Labor and Industries,* 38 Wash. 2d 890, 234 P.2d 487; *Craft* v. *Stone,* 74 Ind. App. 71, 124 N.E. 473.

What is significant in such cases, in our opinion, is not any metaphysical notion of merger of the cause of action into the verdict, but rather the circumstance that all factual questions had been resolved before the plaintiff died. No new trial is involved, and the reviewing court is in a posi-

tion to determine the controversy on the merits. The present case was ripe for judgment when the plaintiff died, and the appellate court properly held that his death did not abate the action. *Garrett* v. *Byerly,* 155 Wash. 351, 384 Pac. 343; see also 1 Black, Judgments, sec. 133, pp. 150, 153.

On the merits the case is governed by the decisions of the Supreme Court of the United States in *New York Times Co.* v. *Sullivan* (1964), 376 U.S. 254, 11 L. Ed. 2d 686, 84 S. Ct. 710, *Garrison* v. *Louisiana* (1964), 379 U.S. 64, 13 L. Ed. 2d 125, 85 S. Ct. 209, *Curtis Publishing Co.* v. *Butts* (1967), 388 U.S. 130, 18 L. Ed. 2d 1094, 87 S. Ct. 1975, and particularly by the decision of that court in *St. Amant* v. *Thompson* (1968), 390 U.S. 727, 20 L. Ed. 2d 262, 88 S. Ct. 1323. In the latter case the Supreme Court restated the *New York Times* test, that the plaintiff in such an action must prove that the defamatory publication "was made with 'actual malice'—that is, with knowledge that it was false or with reckless disregard of whether it was false nor not." (376 U.S. 254, 279-280, 11 L. Ed. 2d at 706.) Then, conceding that "reckless disregard" cannot be fully encompassed in one infallible definition, the court pointed out that its decisions subsequent to the *New York Times* case had furnished "meaningful guidance for the further definition of a reckless publication", and continued: "Mr. Justice Harlan's opinion in *Curtis Publishing Co.* v. *Butts,* 388 U.S. 130, 153, 18 L. Ed. 2d 1094, 1110, 87 S. Ct. 1975, (1967), stated that evidence of either deliberate falsification or reckless publication 'despite the publisher's awareness of probable falsity' was essential to recovery by public officials in defamation actions. These cases are clear that reckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing. There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication.

Publishing with such doubts shows reckless disregard for truth or falsity and demonstrates actual malice." 390 U.S. at 731, 20 L. Ed. 2d at 267.

The court frankly recognized that "such a test puts a premium on ignorance, encourages the irresponsible publisher not to inquire, and permits the issue to be determined by the defendant's testimony that he published the statement in good faith and unaware of its probable falsity." Nevertheless the court adhered "to the line which our cases have drawn between false communications which are protected and those which are not." It did so in the belief that "to insure the ascertainment and publication of the truth about public affairs, it is essential that the First Amendment protect some erroneous publications as well as true ones." 20 L. Ed. 2d at 267.

We turn, then, to an examination of the facts of this case in the light of these principles. In the mayoralty election in connection with which the disputed article was published a controversy had arisen between the incumbent mayor and the person who claimed the office of chairman of the local police and fire commission over the authority of the mayor to make temporary appointments to the local fire department. On the ground that the man who claimed the office of chairman of the commission had never qualified for that office, the mayor had repeatedly made temporary appointments of a particular individual although a statute and an ordinance apparently vested all power of departmental appointments in the commission.

The author of the article, a reporter and assistant publisher of the defendant, testified that he wrote it on the basis of interviews with the incumbent mayor and the man who claimed to be chairman of the commission. He could not recall whether either of those he interviewed had used the term "break" in describing attorney Tunnell's anticipated action with respect to the applicable ordinance and statute.

He did testify, however, that the mayor had said that if the law was as the chairman of the commission contended, "it should be changed."

The author testified that he felt the word "break" had one meaning which connoted *violation* and another which implied *alteration or change,* and that he had intended to convey the latter meaning. Attorney Tunnell testified that he had never done any work either to change or break the law with regard to appointments by the police and fire commission, although he had prepared a statement, read by the mayor at a meeting of the city council, which dealt with the failure of the chairman of the police and fire commission to satisfy the statutory prerequisites of his office.

The *St. Amant* case was tried before a judge who found for the plaintiff, while the present case was tried by jury. But we find nothing in the opinions of the Supreme Court to suggest that this circumstance would justify a relaxation of the standards that have been held to be required by the first amendment. In that case, as in this one, the defamatory utterance was made during an election campaign. The fact that in that case the publication was made by one of the candidates while in this one it was made by a newspaper published for profit, does not appear to justify a difference in the standards by which liability is measured.

The core of the plaintiff's case is the use of the word "break" in the sentence "*  *  * Atty. Tunnell was working to break the law  *  *  *.*" The plaintiff would have us view this word in its most unfavorable sense and find that it imputed to Tunnell an intention to violate a law. But this construction is not inevitable, for Tunnell's office did not require him to administer or enforce the statute or ordiance. Responsibility for "changing" the law by drafting a new ordinance or statute, could, however, reasonably be imputed to the city attorney who was the legal advisor to the mayor. The record shows that a legitimate question existed as to the authority of the incumbent mayor to make

temporary appointments in the fire department under the applicable statute and ordinance. The mayor had expressed his dissatisfaction with that legislation, and the author's assumption that Tunnell would be the person most likely to bring about a change is not, therefore, entirely without basis.

The reporter's elaboration of the mayor's remark was singularly imprecise, but the skill and sensitivity of an author's expression does not determine liability. The jurors were instructed that they were "to take the words used in the sense which readers of common and reasonable understanding would ascribe to them, that is, according to their common and ordinarily accepted meaning." This instruction failed to anticipate the movement away from objective standards of reasonable or reckless conduct, and toward an emphasis upon the subjective frame of mind of the actor, which has characterized the development of the new constitutional common law of libel.

The statement here in question was made during a political campaign by a writer who opposed the re-election of the incumbent mayor. It was intended to disparage the plaintiff, and thereby to reflect adversely upon the mayor who had appointed him to public office. Such an intent, however, is distinguishable from that which is now necessary to support a finding of "actual malice." We are compelled to hold that the statement bears sufficient relationship to the facts to negate the conclusion that its author intended to disseminate information which he knew to be false, or about the truth of which he entertained serious doubts. We are therefore required to reverse the judgment of the appellate court.

*Judgment reversed.*